He monitors the first case of the afternoon, call 213-049, People v. Jeffrey Sielck, on behalf of the Iowans, Mr. Christopher McCoy, on behalf of the people in this setting, a source. Mr. McCoy. May it please the court, counsel. My name is Christopher McCoy from the Office of the State Appellate Defender, and I represent Jeffrey Sielck. This case arises from a very unusual set of circumstances, and while these facts are certainly bizarre, they are mainly indisputable. Based on the evidence presented at trial, it's clear that Mr. Sielck crashed through the door of Mrs. Stevens' home and then tackled Mrs. Stevens. But he testified that he did not crash through the door, that he fell through the door and never really made entry. Yes, but his testimony was contradicted by both his son's statement and the physical evidence found in the home, specifically the photographs of where his blood was located several steps into the home. And so both of the essential elements of home invasion, the unlawful entry and the intentional injury, were clearly present here. The one real question didn't have to do with the elements of the crime. Instead, it was about whether or not Mr. Sielck was sane at the time of the offense. However, the defense counsel did not raise the insanity defense at trial. And it is because of this failure, this ineffectiveness, that we are asking for a new trial so that the one issue that's really the heart of this trial, Mr. Sielck's sanity, can be heard and can be decided. What should counsel have done, specifically? Because it's clear that this has gone on for some time. There have been several evaluations, and he was aware of all of those fitness-to-stand trial evaluations. He had gotten permission to look at Medi-Cola, any other history that he had. So what else should he have done, other than say some magic words? Well, he should have presented the evidence. Excuse me. What evidence, counsel, if you can be more specific in your answer to Justice Hutchinson? From the pre-sentence report, we have several pieces of evidence that would have supported an insanity defense. And we've laid them out in our brief, including testimony from his friends and family, the defendant's friends and family, medical records, the various psychiatric evaluations that were conducted. All of this evidence was available to counsel and could have been used to support an insanity defense. But that evidence really was that he was acting strangely, he was under stress, he maybe wasn't thinking the way he had before. But how does that equate with an insanity defense? Well, I think a good example comes from the case of People v. Young. And in that case, there was also no reports or no evaluations explicitly saying that the defendant was insane. But there was several different instances of the defendant's bizarre behavior at the time of the offense, and that's what we have here. Another similar example would be People v. Dwight, in which case there the defendant similarly, his family members noticed marked changes in his behavior. He'd been expressing paranoid thoughts, thought the FBI and CIA were coming to kill him. And in that case as well, there's no expert that found the defendant to be insane at the time. However, the court held that an insanity instruction should have been given. And that's equivalent to the standard we're dealing with here when it's in effectiveness. This isn't a sufficiency of the evidence challenge. All we need to show is a reasonable probability that this defense would have been successful. Well, this trial judge heard, since it is a trial, it's a trial by a judge as opposed to a jury trial in this case. He heard some of the people, I think, from the hospital. Of course, this is after the injury. But he's heard things about he thought that there were Chinese or somebody was a Chinese spy. He heard testimony that the defendant thought he was, well, believed he was going to be sworn in as Vice President of the United States. But the evidence before is that he unplugged the computer and something else, you know, plugged and unplugged, unplugged and unplugged. That he paced and that he seemed to be under stress. But the court also heard that he had gone through a rather contested divorce where he, where the mother of these children was thought to be mentally ill. And so he was the custodial parent of three children. Shouldn't the court have taken that into account as well in terms of this strange behavior? Well, first of all, I believe much of that evidence that you just discussed was not introduced at trial. It was in the pre-sentence report, but it was not actually introduced at trial. And to whatever extent it was, defense counsel never argued an insanity defense. And so the court was not obligated to view this evidence in the light of insanity. The record reflects that counsel interviewed family members. He was privately obtained, correct? Yes. And that he talked to family members, discussed with family finances to hire an outside expert to have the defendant evaluated for potential defense, correct? Yes. And ultimately, the state agreed that Dr. Chantry could evaluate the defendant for any potential defenses. That was after she left the county employee, correct? But ultimately, there was no report indicating insanity. Yes. Nothing in the record, correct? That's correct. Isn't this a case where the attorney, I mean, based upon the record, it looks as if he was exploring a mental health issues from the very beginning. That's true, but his decision not to present an insanity defense cannot be considered a sound strategic decision given the rather unique facts of this case. But at this stage, you've got to demonstrate that there would have been a reasonable likelihood of success of that defense at trial. Yes, and that comes from all of the evidence that was in the pre-sentence report and all the evidence that was available to trial counsel at the time of trial that he did not present. And we've laid that out in our brief. One thing I would like to focus on was Kim Menini, and she talked to the defendant immediately before he went over to the Stevens' residence. And she said that this conversation was very disturbing. He sounded quite different than he'd sounded before. He accused her of lying about Wakanda police officer Mike Yost, whom she had never met. He also said he was working with the Chinese on top-secret material, and he thought there was some type of wiretap or eavesdropping device on his phone. So her statements give us a snapshot of the defendant's mental state at the time of that offense. And it also shows that his later delusions, his later hallucinations were not simply the product of the traumatic injury he suffered as a result of this incident. Well, we don't know that, do we? He was on a lot of medication. He'd undergone surgery. I mean, how can you really make that deduction or conclusion? Certainly there's a reasonable probability of it. And when he's experiencing and saying some of the same delusions, if you will, expressing some of the same delusions that he did later, particularly about the Chinese spy and this odd fixation he has on Officer Yost, I mean, it seems clear that there are mental issues occurring before this offense is committed. And when you look at his family's statements as well, they had seen for several weeks leading up to this incident that there had been marked changes in his behavior. But, you know, we use this old term, because you're crazy doesn't mean you're insane. The definition of insanity, you're familiar with the definition of insanity. You have to show that you have a reasonable likelihood of a finding that the defendant was mentally ill, which you can't get unless you present an insanity defense. You have to show that there's a reasonable likelihood of success that a defense of insanity would have been successful at trial. And all the evidence points to the defendant's consistent statement denying that he entered. That was his, and it remained pretty much consistent through all the evaluations, correct? Yes. He went over there to get his son, but he never actually entered. He's impeached by his own son, and no doctor, you know, said that his memory of the events was delusional. That was just what he reported, correct? Well, several of the doctors, I believe there's one doctor, Dr. Chantry. There's a second doctor in the post-sentencing, but Dr. Chantry, I think, does three evaluations of him. And she says that he may be misremembering this incident. She also says that he was possibly insane or delusional, I can't remember the exact term, but at the time of this event. And, again, we're not – this is not a sufficiency of evidence challenge. All that's needed is a reasonable probability of a different outcome, and perhaps there's some facts in favor of the state. Perhaps there's certainly facts in favor of that Mr. Silk was insane at the time of the offense. And that's for the trier of fact to weigh, and that's what we're asking, is that this case go back for a new trial so that the trier of fact can hear the relevant evidence and decide what the real issue that's at the heart of this case. Because, ultimately, when you look at the facts of this case, which, again, are very bizarre by any account, only one explanation can account for the defendant's actions here. And that's that he was insane at the time of this offense. Well, he – again, you use that term of throwing it out there. Insanity is a legal definition. He prepared to go over there. He put the metal plate in his – underneath his clothing. He told his son to use a fictitious name as he approached the door. It doesn't – I mean, you have to evaluate all the evidence to determine whether or not a defense of insanity would be – have a reasonable likelihood of success. And when you're looking at the decisions of counsel, he tried to get an opinion. He came up short. The judge said on the record, I thought you were going to have an expert opinion. And he said, well, we didn't get that, but they tried to come up with a plea agreement. Should we look at that? Look at counsel's overall performance or just in isolation look at the facts that you're suggesting would lead to viable insanity defense? Or do we look at counsel's entire performance? Look at his overall performance. Look at the defense he presented. It had no legal basis. He asked for his client to be found not guilty because he did not intend to commit a felony when he entered the house. That's not a legal basis for an acquittal on home invasion. The only way that that would be relevant is if the defendant was invited into the home, which by every account he was not. So looking at his overall performance, looking at his trial strategy, it was based on a misapprehension of the law. And it was not a strategic decision of way what defense to present, especially when all this everything in this priest, you know, presents investigation was there and ready for ready to be presented at trial. Well, what is he to do, though, when his his client apparently chose to testify and that would be his decision to make? Yes. And he got on the stand and persisted in I never went in that house. How is and how is he going to take all of this other evidence that is in the PSI that predates the incident and the obvious medical issues that could have impacted it? How how does he take that evidence against? I never went in there. Well, it's well settled in the law that you can't present a reasonable doubt defense and an insanity defense at the same time. But if you look at what counsel did, he didn't choose to adopt his client's testimony. He didn't choose to argue that what Mr. Silk testified to was the true account of what happened. Instead, he said that we're not going to argue whether that being Mr. Silk's testimony constitutes entry or not, because there is some evidence that you heard about what happened inside that house. Then he further really contradicts his client's testimony by asking for lesser convictions of battery and criminal trespass, which contradict Mr. Silk's statement that he never entered the house and that he never touched Mrs. Stevens. So counsel had already decided that he wasn't going to adopt his client's testimony. And when we have these facts here, it's simply it was not reasonable to to argue or to adopt his client's testimony because it was contradicted by the rest of the evidence that was presented at trial. So at that point, he needed to look at what viable defense he could present. And the only one available is insanity. And I mean, to the fact that he didn't have a report or an evaluation stating that the defendant was insane. Well, the same thing occurred in People v. Young and in People v. Mann. People v. Young is a different situation. It was after a discharge hearing, correct? That's true. But again, it's the same. And in Young, wasn't that the case where there were accusations about killing the mother or whatever and she was actually alive, not deceased? But we had I mean, obviously, there's going to be factual distinctions in every case. But in both of those cases, there was no specific finding of insanity under the legal definition of insanity. Yet the courts in those cases still found ineffective assistance for not raising the insanity defense. But didn't the trial judge hear Dr. Chantry? Maybe not as called by. I mean, the trial judge. Well, but here's the point. It's the same trial judge. He's hearing evidence about what the defendant has told Dr. Chantry. And must he disregard that information? I'm not following your question. I mean, he may not have called Dr. Chantry at trial, but is he to disregard everything that's happened with Dr. Chantry to that time? Oh, I believe so. I mean, I believe. Well, he's the trier of fact both times. The trier of fact is, I mean, it's the same with the jury. The judge is limited to the evidence that's presented at trial. And nothing regarding insanity was presented at this trial. In terms of mixing apples and oranges here, you look at counsel's entire performance, not in isolation. He has to deal with what his client's telling him, his client's insistence on taking the stand, and also what he's been able to muster throughout, what was it, four years of pretrial litigation, where he's speaking to Dr. Chantry, getting reports, having her appointed or retaining her to do an independent evaluation on a defense. He talked about a defense that was no longer fitness, and he came up short and no indications. Now, we don't know what's beyond the record. We don't know if some lay opinion might be out there that your client was insanity defense. What we have to deal with is what is in the record before us now. And on this record, unlike Young and White, where it was not clear from the record that the defense explored insanity defense, here we have that record that defense counsel explored the possible insanity defense here and did not present it. But it still has to be a sound strategic reason. Just because he made some decision doesn't mean that he was acting as an effective attorney. You have him saying on the record that he attempted to get an opinion. He came up short. And as an alternative, he sought a cap on a plea offer, which your client rejected, which is his right, and went to trial. Well, maybe if this was more of a chronic scenario where we're complaining of a complete absence of counsel, but that's not it. It's strictly. So we're looking at this decision. We're looking at his action here. And what did he do at trial? What defense did he present at trial? And given, I mean, I keep going back to that, but given the unique, bizarre facts here where this client's testimony is completely contradicted, where his defense has no basis in the law, then he needed, it was not a sound decision to not present this viable insanity defense. Let me hear your version, a summary version of your argument on this record that your client was insane at the time of the offense based upon the record. Well, again, it's in detail laid out in our briefs. But first of all, we have, I think we need to go back to the point that no opinion, export, or lay is necessary for a finding of insanity. And if this were a sufficiency of the evidence challenge, yes, this would not hold up to a sufficiency of the evidence challenge. But all we're looking for is a reasonable probability. So what do we have? We've got the family members and the friends that notice this marked behavior, marked change in his behavior. Then we have the very bizarre facts of this offense itself. He's wearing this metal plate under his shirt. He goes over to a house of the people who he has never known. He attacks Mrs. Stevens with no motivation. And then even after he's shot, he's not retreating. This is simply are not the actions of a reasonable man. And this is, of course, following. People who attack other people usually aren't reasonable. That does not make them insane. Given this is not a normal attack. I mean, this court is well aware through its many experiences of different crimes. And looking at the facts, this is not a normal home invasion. I mean, obviously, home invasions are odd to begin with. But this is just very unique, very bizarre case. And the one issue here, the one issue that needs to be decided is whether or not Mr. Silk was sane at the time of the offense. And because counsel never presented it, the triumvirate never had the chance. In evaluating his performance, there's one thing that you're leaving out of your analysis. You have to show that an insanity defense would be viable, which includes the fact that the burden of proof is on the defendant to show by clear and convincing evidence that he was insane. Isn't that part of the equation for a defense attorney before he presents that defense? It is, and I would go back again to People v. Dwight where, I mean, that question was whether or not an insanity instruction should be given to the jury. So it's a fairly equivalent question here. And in that case, there is similar bizarre behavior. There is no expert finding of insanity in that case. And there was no witness that was going to say that the defendant lacks substantial capacity, yet that conviction was still reversed because the insanity instruction was not given. I think we'll have an opportunity, Mr. McCoy, for a response. Thank you. Ms. Swiss? Good morning, Your Honors. Good afternoon, I should say. Sally Swiss for the People. In this case, this was an unusual case, obviously. The facts are very unusual. But I believe that defense counsel did the best with what he had and that his primary argument in this case was reasonable doubt. I'm going to contradict defense counsel's theory that there wasn't a viable reasonable doubt argument made here. There certainly was. Not only did the defendant testify that he, you know, that the door was closing and he thought his son was in there and he thought he had been invited in. He testified that he, you know, he fell in, basically, as the door was being closed. And while his attorney did not go further and argue that he didn't make entry, he did certainly argue that there was not a knowing entry in the sense that he did not do this volitionally. He fell through the door. And that not only that, but once he was in, he says he did not make contact with the homeowner. That, you know, there was, of course, a lot of evidence about the chaos that ensued once the gun, the shots began. And that, you know, at some point there was certainly an inference from that that she may have been injured at some point because she herself suggested that all three of them were fighting at some point as he was in the house and they were trying to get him out of the house. And he was being shot at. The defense counsel did at one point, I think, was in his argument. Of course, as I said, this is to the court as opposed to a jury, so a judge can disregard things if appropriate. But he misstates the law of home invasion. He says that the defense counsel did, that he didn't intend to go in to commit any sort of a felony. That's really not an issue. Well, I think we take his misstatement of the law in this case. I think in looking at his statements throughout, he was saying two things, not that the defendant did not go in there with an underlying intent to commit a felony. In other words, something like burglary. I don't think that was his argument. His argument was that he was mistaken, that he arrived at the door, that the evidence, in fact, showed that he got a phone call, that he, in answer to that, where he had dropped off his son. He went to the same neighborhood, that he thought about whether this was the same house, decided it was, went and asked for his son. So this was all part of his mistake, and that goes to whether he made a knowing entry and whether, in fact, he had some type of criminal attempt to actually go through the door in the first place. Not so much that he thought that this was the same as burglary. Also, he did make what I would consider to be a factually non-supported argument, which is the limited authority. And it wasn't a bad argument, except that the facts here, but it was a secondary argument. The facts here showed that, in fact, no one had invited him in, even by the defendant's own account. No one had invited him in through the door. And so, but that went to without authority. And for that, you have to have both that, you know, you have no criminal intent and that you've been invited in. So I think it went to that. That's the way I read those remarks. What about not putting on, even though he, on the day of trial, listed an insanity offense in discovery and then not even arguing insanity? Well, I have to admit that it surprised me. I do believe, though, that counsel did try to bring in evidence, and I set forth that in my brief, that he did actually set forth evidence by cross-examining the state's witnesses about not running away after the shooting, about not having a mask to conceal his identity, about not resisting the officer, so that if the court did not, you know, determine that this was an intentional act on his part in coming here with, you know, perhaps the metal plate to do some, you know, some sort of criminal act, that the mental illness and the insanity was in front of the judge. Well, except without him directing the judge or mentioning an opening or closing, how was the trial judge really to be able to focus on that? Well, I have to admit, you know, in that regard, I believe that the defense was there, and I believe the defense was being offered for insanity or mental illness. But the judge said completely the opposite. He said there's no insanity defense being presented here. Does he say those exact words? He does. He will. I'm paraphrasing. I read the record. Right. He says the only defense here is that your client indented. I took what the judge's comments to be were that, in fact, that there wasn't a defense presented in the sense of it did not amount to insanity. In fact, the judge, in his remarks when he was finding him guilty, said something to the effect that there's nothing here, you know, that I can tell that answers the question of why he did what he did, you know, seeming to indicate that, in fact, he was considering whether there was some type of, you know, a mental illness that impaired his judgment or that there was something to show that he didn't understand the criminality of it. During the pretrial proceedings, the state stipulated that the defendant was mentally ill. The state did say that they believed that he was mentally ill. But he does have mental illness in the sense that throughout the evaluations, all the evaluations, I think, from Chantry and I believe the final one for the PSI, which was a different doctor, all came back saying that he had a personality disorder. So that was axis one or two, diagnosis of mental illness. And I think that's what the ASA was saying, that there's clearly some mental illness here, that he certainly has some mental health issues. And the trial court found that in sentencing. But I think the trial court, what we have to look at in terms of whether or not this is ineffective, we have to look at would the result have been different. And, of course, we have a trial judge who not only who at sentencing has all this information in front of him, who seems very much to have read every little thing, including correcting things that occurred at page 16 in the PSI. But counsel doesn't have to show that the result would have been different. He just has to show that there's a reasonable likelihood that if the insanity defense was offered, the result may have been different. And here, if he had offered the insanity defense, it at least would have put him in a ballpark to get a guilty but mentally ill verdict. Well, I think that there's, to be perfectly honest, there's no evidence in terms of what, we have to look, of course, at the time of the incident in terms of whether or not at that point he had some type of mental illness that impaired his judgment. And there's nothing to show that. In fact, the evidence clearly shows the opposite. Among the facts of the case, he puts a plate under his shirt, gives his son these bizarre instructions, and breaks into a home for no apparent reason. Well, he didn't go there. I mean, it certainly seems that he went there to pick up his son. He gets a phone call. He breaks in for no, when I say, I'm talking about his conduct once he arrives at the home. It seems to be off the wall, off the charts, bizarre. Well, it does seem to be bizarre, but bizarre does not actually mean mentally ill such that his judgment was impaired. And certainly, counsel tried and tried through all those, not only the fitness evaluations and one additional one ordered by the court, but then all through 2012, which is about five or six hearings that came up, status calls and that type of thing. Counsel kept saying, I've asked Dr. Tantry for a full evaluation. So I think that he was, again, asking for yet an additional evaluation of his client, and that was never presented at court. But even if it's not, just put on the bizarre behavior. I mean, it's a defense attorney. I was in the trenches. You put the case on and you hold the state to their commitment. They stipulated the defendant was mentally ill at the time of the offense. That at least gives him the benefit of maybe a statutory mitigating factor for sentencing. Your Honor, first of all, I'd like to say that I don't believe there was a stipulation. I do believe he made a comment. In the pretrial proceedings, the prosecutor said, and I don't have the page in front of me, but he said. He said he believed, yes. I know he made a comment at one point that he thought he was. But that comes from, you know, and certainly there's something here in enough that you could have raised, you know, the insanity defense. And I differ from Your Honors in that I believe that he did raise it. He didn't do maybe the best job possible, but we're looking at was there prejudice. And when I go to the comments that the trial court very clearly made at sentencing when he had all this in front of the hospital notes, which, of course, opposing consulates said were very important, to show that afterwards he thought he was there to meet an old acquaintance that Officer Yost had set up. Well, first of all, the conduct certainly does not go along with that type of, you know, does not show that he was delusional in that way at the time because there was no mention of any of that. He was going to get his son. In fact, he said to his son, his other son, Jeff, Jr., you know, we're going to go get your brother. When he got there, he told him to go get his brother. He asked the homeowner for this son. It does not appear that that later delusion under medication and physical trauma to his head was something that he had at the time. So I think part of the problem with defense counsel had is he was bringing up a reasonable doubt argument. That was his defense, basically, and I think he did a good job with that. He also tried to bring in what he could through cross-examination, and he got in evidence from Detective Buffington, I think was his name. He got in evidence through him that was not objected to, hear say that, about what defendant's father and mother thought, that they thought he had had a mental break, you know, that he had been through a lot recently, that he was talking nonsense on the day or the day before the day of this particular. So he did present all that. And when the trial court got the additional information, the kin-minity information, which was sort of cumulative and which didn't really necessarily go to what he was thinking at the time and certainly doesn't reflect his behavior at the time. When he got that information, he looked through all of it and said, I don't see any reason here that explains his behavior. So even at that point, the judge did not take this to signal that at the time of the offense that he was either impaired by mental illness or that he was criminally insane. And because of that, you know, the sentencing issue is also in the brief, and that's the reason he also didn't consider it really, if he considered it mitigating, he certainly didn't consider it so mitigating as to, you know, he considered it. He said, as I hope he gets mental health treatment in prison, and I think that's important. He's not ignoring the information, but he's determined that that information does not reflect on the defendant's mental state at the time of the crime. And therefore, under an effective assistance of counsel, he can't show that there is a reasonable probability that the result would have been different. The state argues, it looks like in closing argument, they even concede that guilty but mentally ill could be justified, but then they say, but he didn't hear voices or see things that didn't appear to be there. Now, is that a standard to find someone insane, or are they just arguing because it seemed, you know, I don't know what that means. I'm not sure what that means except to the extent that I believe he's talking about the small part of things afterwards go to a possible episodic delusions. And of course, you know, if he's having episodic delusions, which is not clear because of his head injuries and, you know, that that's from, you know, it's a mental illness that predated his trauma. But if he's having that, then of course we have to look at the moment of it. You know, and again, we have no evidence that at the moment of it, and no expert testimony and it seems like defense counsel did try for that, but also just nothing to show that the facts themselves seem to indicate otherwise. So I think what the ASA was trying to say at that point is just, you know, if there's some type of delusions, you know, we don't see that as pertinent here. But no, that's not exactly obviously the proper test. If there are no other questions, we would just ask this court to affirm the defendant's conviction. I do have one question, and I will ask Mr. McCoy as well. How long before this incident on December 26th was this divorce proceeding concluded? I think it was quite some time. I believe that was several years, like prior to the incident, a couple years before that. There were ongoing, apparently from what I can understand, there were ongoing hostilities. There were a lot of temporary restraining orders, that type of thing, and there had been some allegations of mental illness of his ex-wife and their DCFS involvement. So it was quite bitter. Justice Burnett? Thank you very much. Mr. McCoy? Let me just ask that question up front for you. Do we know how long before this incident? In the PSI, I couldn't just by a quick glance at my notes. It didn't just happen on December 5th, and this is now happening on December 26th. No, I do believe, though, that there was evidence or statements in the PSI that there had been recent court appearances and that his ex-wife was still attempting to get custody of the children in this few weeks before this incident. So the divorce, I believe you're correct, occurred several years before this. I think the ongoing custody battle continued. Initially, insanity defense was not presented in this case. There was no argument. The defense counsel did not ask for not guilty by reason of insanity. The court did not rule on this. In fact, the word insanity was never mentioned one time during trial. Is that a prerequisite? If you're in a bench trial, I don't see how else you could. The affirmative defense must be raised by the defense. If you do not ask for it, how is the court to know that this is what you're doing? In People v. Hayes, the defense filed an answer to discovery similar to this case, asserting insanity defense but still did not present any evidence of it, and the court there held that that was ineffective assistance. Along with that, this was not a strategic decision in the sense that the defense counsel believed that insanity was not a viable issue. In fact, at every stage of this proceeding except for trial, defense counsel seemed to believe this was a very good issue. We have that answer to discovery, the MIDI fitness evaluations, and most poignantly, I think we have his argument, counsel's argument at the sentencing hearing when he said, quote, well, the defense may not have done any decent job of demonstrating to the court. We still believe that Mr. Silk did not appreciate the criminality of his conduct at the time that this offense was committed. So here we have an admission by counsel, he believes in the insanity defense, and an admission that he did not do, as he says, a decent job of presenting it at trial. Well, but isn't that in and of itself an argument that, an evidence that his decision was one of strategy? Not that he didn't know what to do or how to do it, but that he made a decision based on what he had to work with that it was not a viable defense. I don't see that from the court at all. I think that he's saying it is a viable defense, and I messed up. I did not properly present it in the trial court. And if, you know, the fact that he's still arguing for it seems to suggest that he still believes in it. On the morning of trial, he files the notice of intent, but he still doesn't have an expert that he has acquired. So now how are we going to get to an expert or get some evidence when, you know, obviously they've done a list of witnesses, they've done all of these things. Why is he filing that motion or that notice of intent on the date of trial? I can't answer that. It seems very odd. I will point out, though, that he had these several evaluations from Dr. Chantry, and while these were mainly dealing with fitness and not sanity at the time of defense, in the second fitness evaluation she said that it appears that the defendant may have been delusional at the time of the arrest, and that it also appears that he's not malingering, at least in terms of his delusions that he had in jail. So there was, you know, possible expert evidence at least suggesting this defense. And, again, I'll go back to the fact that an expert opinion is not necessary to prove insanity. In fact, even a lay opinion is not necessary, and lay testimony, particularly close in time to the offense, like we have from Kim and Nitty, is very relevant to showing the insanity defense. Do you also agree that lay evidence of strange behavior or distorted or irresponsible behavior in the commission of atrocious crimes does not alone justify reasonable doubt as to sanity, correct? It doesn't necessarily justify it, but, again, that's we're not. Which is what you have here. That's all. I mean, that's what you have here. We have evidence for the trier fact to decide and to weigh, and that's what we're asking for again. We're asking for a new trial so that this issue can be heard by a trier fact and can weigh all the evidence. Now, on this evidence, given the burden of proof, where is the reasonable likelihood? Again, on this record, I'm not talking about post-conviction or something we may not be aware of. What was in that final report from Chantry, which we never saw, is not in the record. On this evidence, where is the reasonable likelihood of success of an insanity defense? All of the evidence that was in the presense investigation, everything that his friends and family saw, his marked changes in behavior, the delusions he had while in the hospital, while in jail, the fact that, again, bizarre facts of this crime themselves. And I don't know if there was any final report from Dr. Chantry. We don't know. We just know that she evaluated, and the case has continued a number of times after she was finally retained. I believe that was just the third overall psychiatric evaluation, which was included in the presentence report. And then she was retained privately after she left the county employed. Yeah, but it doesn't seem that any report was made because the court ordered that all of the evaluations be included in the PSI, and they were, including another one that was made after his conviction, but there was no one that's retained by private counsel that's not favorable to the defendant would not be included in the record anyway. Counsel, I don't have exact quotes in front of me, but counsel seemed to indicate that all of these psychiatric evaluations would be included in the presentence investigation. Unless there are any further questions, Mr. Silk respectfully requests that this court reverse his conviction and remain for the trial, or alternatively to reduce the sentence. Thank you, counsel, for your argument. We appreciate them. We will take this matter under advisement. A decision will be made in due course, and we will now stand adjourned for today. This court is adjourned.